UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
**UNITED STATES OF AMERICA**        )
                                    )
         v.                         )   Crim. No. 04-10288-RWZ
                                    )
**PHILLIP ALBERT, JR.**             )
_____)

### SENTENCING MEMORANDUM OF THE UNITED STATES

The United States of America, by its attorneys, United States Attorney Michael J. Sullivan, and Assistant U. S. Attorneys David G. Tobin and Michael J. Pelgro, hereby files a sentencing memorandum in the above-referenced case for the use of the Court in determining an appropriate sentence for Phillip Albert, Jr. (Albert).

### Background

On June 30, 2004, Albert was arrested pursuant to a warrant issued by United States Magistrate Judge Charles B. Swartwood. Albert appeared before Magistrate Judge Swartwood on the same day and was temporarily detained. On July 2, 2006, Mitchell appeared before Magistrate Judge Swartwood and was released on a $25,000 unsecured bond and with conditions. On September 22, 2004, a federal grand jury in Boston, Massachusetts handed down an Indictment which charged Albert with conspiracy to possess with intent to distribute, and to distribute, oxycodone in violation of 21 U.S.C. § 846 (Count One) and distribution of oxycodone (Count 4) in violation of 21 U.S.C. § 841(a)(1). Twelve

other defendants also were charged in the Indictment. On January 31, 2006, Albert's Pretrial Conditions of Release were amended to include the condition that he participate in inpatient drug treatment.  On March 17, 2006, Albert appeared before the Court and tendered a plea of guilty to Counts One and Four of the Indictment.  The Court deferred accepting the plea until the date of sentencing.  Albert's sentencing is scheduled for August 29, 2006.

## Presentence Report

In its Presentence Report, U.S. Probation determined that Albert should be held responsible for the 10 eighty milligram OxyContin tablets, which were the subject of Count Four of the Indictment; as well as the 10 eighty milligram OxyContin tablets that co-defendant Keith Behsman distributed to an undercover agent on November 4, 2003.  During the November 4, 2003 distribution, Behsman indicated to the undercover agent that Albert was his alternate supplier of OxyContin.  U.S. Probation increased the number of eighty milligram OxyContin tablets for which Albert should be held responsible to 200 based on statements made by Albert to an undercover agent on February 11, 2004.  During negotiations with the undercover agent, Albert informed that agent that he (Albert) had three different sources of supply from whom he buys 200 OxyContin tablets every other day.  On the basis of those comments by Albert, U.S. Probation increased Albert's OxyContin total to 200 eighty milligram

OxyContin tablets.

**Government's Position on OxyContin Amount Attributable to Albert**

The United States believes that Albert should be held accountable for at least 2,400 eighty milligram OxyContin tablets, which would result in a Base Offense Level (BOL) of 32. This amount takes into consideration the 10 eighty milligram OxyContin tablets Albert assisted in distributing to an undercover agent on November 5, 2003, and which forms the basis of Count Four of the Indictment; it also takes into account the 10 eighty milligram OxyContin tablets that Behsman received from Albert and distributed to an undercover agent on November 4, 2003, and which U.S. Probation considers to be relevant conduct. Finally, the United States' belief that Albert is responsible for a total of at least 2,400 eighty milligram OxyContin tablets takes into consideration the full breadth of Albert's distribution of OxyContin. A review of Albert's actions, including his negotiations for the purchase of 700 OxyContin tablets from the undercover agents, Albert's statements, and the statements of co-defendants, including Behsman, establish that Albert is responsible for at least 2,400 OxyContin tablets.

<u>Reverse Negotiations</u>

At approximately 5:05 p.m. on January 27, 2004, an undercover agent received an incoming call from Behsman, who stated that "Phil" (Albert) was interested in buying 1,000 OxyContin pills but that "Phil" thought that he should be able to

purchase that quantity at a $25 per pill rate.  Behsman said that he would call the undercover agents back when "Phil" was prepared to meet with the undercover agents.[1]

At approximately 2:15 p.m. on February 9, 2004, the undercover agents received an incoming call from Behsman, who requested that the undercover agents meet with Albert on February 11, 2004 to negotiate the proposed 1,000 OxyContin pill deal.  At approximately 4:45 p.m. on February 11, the undercover agents placed a consensually-recorded call to Behsman and agreed to meet Behsman and "Phil" (Albert) at the undercover apartment that evening.  Behsman warned the undercover agents not to be "worried" about "Phil's" appearance, explaining that Albert was a "former Marine" who "looks like a cop" and whom his friends nicknamed "The General."  The undercover agents told Behsman that they could "check out" Albert during the meeting to see if they would be comfortable dealing with him in the future.

At approximately 7:00 p.m. on February 11, Behsman knocked at the front door of the undercover apartment and was let in by the undercover agents.  Behsman was in the company of Albert, whom Behsman introduced to the undercover agents as "Phil."  As Behsman and Albert sat down on a couch, the undercover agents asked Albert if he was fully aware of the reasons for the

---

[1] The investigators believe that, through Behsman, Albert became interested in the "business opportunity" proposed by the undercover agents after co-defendant Joseph Baldassano declined to participate.

meeting.  Albert stated that he knew the purpose of the meeting and he explained that he was interested in purchasing 550 OxyContin tablets at $30 per pill.  Albert said that Behsman would pick up the remaining 150 pills to complete their 700-pill order.  The undercover agents told Albert that the deal was for $35 per pill but that they were willing to talk to their source to see if they could get the price down to $30 per pill and that they only wanted to deal directly with Albert.

During the meeting, the undercover agents told Albert that they did not like doing business with Baldassano because Baldassano used "too many runners."  Albert extended his hand in a gesture downward and stated that Baldassano was "down here."  Albert then raised his hand up high and said, "I'm here," insinuating that he was a much higher level drug dealer than Baldassano.  Albert stated that he had been **"dealing [selling OyxContin pills for profit] for years,"** and that he knew how to launder his money so it would not "raise any red flags."  **Albert explained that he has three different sources of supply from whom he buys 200 OyxContin pills every other day.**  Albert told the undercover agents that he worked on an oil truck during the day, which legitimized his income.  Albert commented that his "significant other" had just had a baby, so Albert had to be "real careful."

The undercover agents told Albert that they would contact Behsman after they "got an answer" from their New York source

regarding Albert's request for a price reduction to $30 per pill. The undercover agents assured Albert that he would get an answer by Friday morning (February 13). Albert then stood up, parted company with the undercover agents, and walked out of the undercover apartment. The undercover agents observed Albert enter Behsman's car, while Behsman remained with the undercover agents inside the apartment. The undercover agents then questioned Behsman if Albert could "come up with $16,500 to do the deal." Behsman said that Albert had a substantial amount of money from a lawsuit that was awarded to him for slipping on ice. Behsman continued to reassure the undercover agents that Albert was a "reliable person," not like "Baldy" (Baldassano). Behsman also stated that Albert uses six OxyContin pills a day and that Behsman was "amazed" how Albert was able to function. The undercover agents asked Behsman who Albert's sources were, and Behsman replied that he did not know any names. Behsman commented that one of Albert's sources was "a guy from New Bedford." This meeting was surveilled, recorded, and videotaped by DEA.

While the proposed reverse OxyContin deal was not completed, the importance of the negotiations cannot be overstated.[2] Albert

---

[2] The United States submits that it is appropriate for Albert to be held responsible for the 700 OxyContin tablets that Albert and Behsman negotiated for with the undercover agents. U.S.S.G. § 2D1.1, note 12 permits in a reverse sting situation a defendant to be held accountable for the quantity of drugs the defendant agrees to accept. In this case, Albert agreed to take 550 tablets for himself and 150 for Behsman.

sought to purchase 550 OxyContin tablets [700 tablets if the 150 tablets sought by Behsman are included], which indicates the scope of Albert's ongoing OxyContin selling activities. Albert's statement to the undercover agents **that he has three different sources of supply from whom he buys 200 OyxContin pills every other day** also reveals the enormity of Albert's OxyContin selling business. The Court should not conclude that Albert's statements were idle boasts. Albert's admissions are corroborated by his actions (supplying Behsman with OxyContin to sell to the agents on two occasions), Behsman's comments that he knew one of Albert's OxyContin suppliers was from New Bedford, and the statements of Joseph Baldassano.

During the trail of co-defendants Carlos Espinola and Joseph Allen, Baldassano testified that Albert sold eight milligram OxyContin tablets that Albert obtained twice a month from a different supplier. Baldassano also testified that Albert approached Baldassano for OxyContin when Albert could not obtain tablets from his regular supplier. Baldassano agreed to supply Albert with OxyContin and began supplying Albert with 100 to 150 tablets whenever Albert called him.

Baldassano has informed the United States that Albert sold an average of 150 OxyContin pills each week for four or five months. This calculation alone would result in Albert distributing approximately 2,400 OxyContin tablets. Baldassano indicated that these sales were for Baldassano. Baldassano also

indicated that Albert was among the group of friends that accompanied Baldassano to Espinola's house to pick up OxyContin.

U.S. Probation credited Albert's statements about receiving OxyContin, but estimated that his total number of OxyContin tablets was 200. U.S. Probation took an unwarranted conservative approach, essentially leaving the Court the task of determining how much OxyContin for which Albert should be held accountable. Albert was a prolific OxyContin distributor. We know that by Albert's actions, his admissions, the statements of Behsman, and the corroborated trial testimony of Baldassano. Holding Albert accountable for at least 2,400 eight milligram OxyContin tablets is a conservative approach, but one that is fully supported by the weight of the evidence.

## Sentencing Recommendation of the United States

Albert's BOL of 32 is adjusted downward by three levels to 29 because of his acceptance of responsibility. Albert has not made a "safety valve" proffer and is not entitled, at this time, to any further offense level reduction. With a TOL of 29 and a CHC of I, Albert's GSR is 87 to 108 months. The United States respectfully recommends that the Court impose a sentence which includes a term of imprisonment of at least 98 months. The recommended sentence, which is not at the high end of the applicable GSR, is warranted because of the severity of Albert's criminal acts and the dire consequences the unlawful distribution of OxyContin has on individuals, families, and the community.

**Conclusion**

For the reasons stated in this memorandum, the United States respectfully requests that the Honorable Court impose the sentence recommended by the United States.

                                      Respectfully submitted,

                                      MICHAEL J. SULLIVAN
                                      United States Attorney

By:  /s/ David G. Tobin
      DAVID G. TOBIN
      Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                      /s/ David G. Tobin
                                      DAVID G. TOBIN
                                      Assistant United States Attorney

Date: August 23, 2006